IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **Donte Hill**, | Case No. 1:19-CV-00308 SJD |
| Plaintiff, | Judge Dlott |
| v. | **FIRST DECLARATION OF DONTE HILL** |
| **City of Cincinnati, et al.,** | |
| Defendants. | |

I, hereby state that the following is true and accurate based on my personal knowledge and belief:

1. I am the Plaintiff in the captioned case and for all times relevant hereto, I have been employed as a Cincinnati police officer and EMT/firefighter with the Deer Park/Silverton District Joint Fire Department.

2. Prior to December 2018, in addition to working 40 hours per week as a Cincinnati police officer, I frequently worked details and overtime to supplement my income.

3. In December of 2018, the Chief of the Cincinnati Police Department suspended my police powers and assigned me to desk duty for an incident that had occurred in September of 2018 and for which I had already received a written reprimand.

4. While my police powers were suspended, I was not eligible to work details or overtime which caused a substantial loss of income.

5. While my police powers were suspended, I was suspended from working as an EMT/firefighter.

6. In February of 2019, I retained attorneys, Zach Gottesman, Esq., and Robert Thumann, Esq., to take legal action on my behalf to compel the Chief and the other Defendants to reinstate my police powers.

7. To engage my attorneys, I had to pay a retainer and agree to pay them on an hourly basis.

8. The Verified Complaint [ECF No. 1-1] was filed on April 26, 2019.

9. My police powers were reinstated immediately after the Verified Complaint was filed.

10. On May 31, 2019, the City issued a Notice of Suspension the imposed a 56 hour unpaid suspension from my employment as a police officer as discipline for the Sept. 2018 incident.

11. The Queen City Fraternal Order of Police, Lodge No. 69 (hereinafter the "FOP"), filed a grievance on my behalf challenging the discipline imposed by the City.

12. The grievance was submitted to binding arbitration.

13. At arbitration, the FOP attorney, Kim Rutowski, presented no evidence regarding my legal expenses incurred in seeking reinstatement of my police powers.

14. The arbitrator issued the Decision attached as Exhibit 1.

15. After the arbitrator's Decision was issued, I did not authorize the FOP attorney, Kim Rutowski, to negotiate a settlement on my behalf that would resolve the claims pending in this case.

16. I reviewed the Settlement Agreement tendered by the City to the FOP attorney, Kim Rutowski and I would not agree to it or sign it because of its effect on the claims pending in this case.

17. The FOP attorney, Kim Rutowski, did not explain to me that when the 90 day period of extended arbitrator jurisdiction expired the Decision became final and binding against the City.

18. As of today, I have not received the compensation the arbitrator awarded me for lost overtime and detail opportunities.

19. I did not authorize the FOP attorney, Kim Rutowski, to extend the arbitrator's continuing jurisdiction.

Pursuant to 28 U.S.C. §1746, I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on April 12, 2020,

_____
Name

## CERTIFICATE OF SERVICE

I hereby certify that on 13 April 2020, a true and accurate copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. No copies of this filing are being mailed to any parties, as all parties are currently being served via the Court's electronic filing system and thereby may access this filing through that system.

/s/Zachary Gottesman
Zachary Gottesman
(0058675)

**Exhibit 1**

# AMERICAN ARBITRATION ASSOCIATION
## IN THE MATTER OF THE ARBITRATION BETWEEN

| | | |
|---|---|---|
| **FOP Queen City Lodge No. 69,** | : | Case No.: 01-19-0001-8762 |
| | : | |
| Union, | : | Grievance: Suspension |
| | : | |
| and | : | Grievant: Donte Hill |
| | : | |
| **City of Cincinnati, Ohio,** | : | Arbitrator's File No.: 19027 |
| | : | |
| Employer, | : | December 5, 2019 |

## APPEARANCES

**For the Union:**

Kim Rutowski, Attorney
Alex Beck, Attorney
Donte Hill, Grievant
Dan Hils, President

**For the Employer:**

William C. Hicks, Senior Assistant City Solicitor
Elliot Isaac, Chief of Police
Steven Fox, Sergeant, Internal Investigations

Daniel G. Zeiser
Arbitrator
P.O. Box 43280
Cleveland, Ohio  44143-0280
440.449.9311
Email: **danzeiser@aol.com**

I.    **INTRODUCTION**

There was no grievance filed in this matter. Under the Labor Agreement by and between Queen City Lodge No. 69 Fraternal Order of Police (FOP or Union) and the City of Cincinnati (Employer or City) Non-Supervisors, For the Years May 22, 2016 - May 11, 2019 (Agreement), grievances involving disciplinary suspensions of more than five days without pay are automatically advanced to arbitration. The Demand for Arbitration in this matter was filed with the American Arbitration Association (AAA) on June 17, 2019 and this Arbitrator was selected.

The arbitration hearing took place on October 3, 2019 at the offices of the City, 805 Central Ave., Cincinnati, Ohio. During the hearing, the parties had the full opportunity to examine and cross-examine witnesses, introduce relevant exhibits, and argue their positions. Witnesses were sworn, but not separated. The parties stipulated that the matter was properly before the Arbitrator and ready for final and binding arbitration. The parties timely submitted briefs to the Arbitrator no later than November 20, 2019 and the matter was submitted.

II.    **ISSUE**

The parties stipulated to the issue as:

> Whether there was just cause for the Grievant's 56 hours suspension? If not, what is the remedy?

III.    **RELEVANT PROVISIONS OF THE AGREEMENT AND EMPLOYER POLICY**

**ARTICLE II**
**Management Rights**

The FOP recognizes that, except as provided in this labor agreement, the City of Cincinnati retains the following management rights as set forth in Ohio Revised Code Section 417.08(C)1-9:

…

5.    To suspend, discipline, demote or discharge for just cause, or lay-off, transfer, assign, schedule, promote or retain employees;

…

With respect to these management rights, the City of Cincinnati shall have the clear and exclusive right to make decisions in all areas and such decisions, except as otherwise provided in this Agreement, shall not be subject to the grievance procedure.

The City is not required to bargain on subjects reserved to the management and direction of the City in Revised Code Section 4117.08 except as affect wages, hours, terms and conditions of employment and the continuation, modification, or deletion of this collective bargaining agreement. The FOP may raise a legitimate complaint or file a grievance based on this collective bargaining agreement.

### MANUAL OF RULES AND REGULATIONS
### AND
### DISCIPLINARY PROCESS
### FOR THE
### CINCINNATI POLICE DEPARTMENT

1.06　A.　Members of the Department shall always be civil, orderly, and courteous in dealing with the public, subordinates, superiors and associates.

　　　　B.　Members of the Department shall avoid the use of coarse, violent, or profane language.

　　　　C.　Members of the Department shall not express any prejudice concerning race, sex, religion, national origin, life-style, or similar personal characteristics.

　　　　D.　Members shall not engage in unwarranted or unwelcome conversations of a sexual nature with other Department members, City employees, or members of the public.

…

1.23　A.　Members who use force or have knowledge of a use of force by a Department member shall immediately notify a supervisor.

　　　　B.　Members shall not use more force in any situation than is reasonably necessary under the circumstances. Members shall use force in accordance with law and Department procedure.

　　　　C.　Members of the Department shall not express, verbally or in writing [sic] any prejudice or offensive comments concerning race, religion, national origin, life-style, gender, or similar personal characteristics.

### Administrative Regulation No. 25

**Purpose**

Discriminatory harassment because of sex, age, gender, sexual orientation, gender expression and identity, marital status, disability, religion, race, color, ethnicity, national origin, Appalachian regional ancestry, veteran status, military status, genetic history and HIV status is illegal and will not be tolerated at the City of Cincinnati.

**Definition of Discriminatory Harassment**

Discriminatory harassment is unwelcome conduct toward an individual because of his or her sex, age, gender, sexual orientation, gender expression and identity, marital status, disability, religion, race, color, ethnicity, national origin, Appalachian regional ancestry, veteran status, military status, genetic history and HIV status, when the conduct is severe or pervasive enough to create an intimidating, hostile, or offensive work environment…

3

…Examples of discriminatory harassment that will violate this policy and may violate the law include:

- Oral or written communications that contain offensive name-calling, jokes, slurs, negative stereotyping, or threats. This includes comments or jokes that are distasteful or targeted at individuals or groups based on age, gender, sexual orientation, gender expression and identity, marital status, disability, religion, race, color, ethnicity, national origin, Appalachian regional ancestry, veteran status, military status, genetic history and HIV status.

**Employee/Non-Employee Discriminatory Harassment**

An on-duty employee who subjects a non-employee (vendor, consultant, sales representative, temporary employee, etc.) to discriminatory harassment in the workplace is subject to this regulation.

## IV. FACTS

The facts in this matter are not in serious dispute. The Employer is the largest municipality in southwestern Ohio. It operates its own Police Department. The Union represents the Police Officers of the Employer. The bargaining unit involved here is the Non-Supervisors, i.e., the sworn members of the Police Department up to and including the rank of Specialist. (JX 1). This includes Patrolmen. The parties have had a collective bargaining relationship for decades. The Grievant has been employed by the Police Department for 11 years. For the last several years, the Grievant has received performance evaluations of "Meets Standards." (UX 11). His Evaluation Supplement Log (ESL) includes an August 2017 counseling for a Failure of Good Behavior violation, Police Department Rule 1.06A and B, for discourteous behavior toward a citizen; and a September 2018 counseling for a Failure of Good Behavior violation, Rule 1.01B for improperly towing vehicles. His ESL also includes commendations in February, June, and July of 2018 for responses, two of which included removing felons from the streets. (CX 1). Prior to working for the Employer, the Grievant worked as a part-time firefighter/EMT for Mount Healthy and the Deer Park-Silverton Joint Fire District. He continued to work part-time for Deer Park-Silverton after joining the Cincinnati Police Department.

The Grievant works the third shift in District 3, considered the busiest in the City. On September 26, 2018, the Grievant and Officer Brandon Contris responded to a call around 1:40 a.m. for a report of an argument at an apartment complex. Officer Joseph Shook responded a bit later. Upon arriving, the Grievant and Officer Contris met the individuals outside the

4

apartment complex and determined that the residents were intoxicated. The Grievant recognized two of them from working in that community. After directing two male individuals to leave, the males got into a physical altercation and had to be separated. Officer Contris tased one of the males. After the tasing, the Grievant said in a loud voice "This is fuckin' stupid. I told you to fuckin' walk home, didn't I? That goddam alcohol got you niggers out here acting stupid." The incident was recorded on the officers' body worn cameras. (CX 3).

Because the incident involved a use of force, i.e., the tasing, the camera footage was reviewed by Sergeant Luke Putnick. He heard the Grievant's language and determined that it was inappropriate. Sgt. Putnick advised District 3 Commander, Captain Paul Broxterman, who reviewed the footage and agreed a written reprimand should be issued. On October 11, 2018, Sgt. Putnick wrote a memo to Police Chief Eliot Isaac requesting an Official Reprimand for a violation of Police Department Rule 1.06B. The memo included the Grievant's language "that got damn alcohol out here got you niggers acting stupid," [sic] as well as "because I'm pissed the fuck off that's why." Sgt. Putnick noted this was the Grievant's second violation in the last 36 months, the first being a counseling documented via an ESL entry. The memo included a link to the body camera video. (UX 1). The written reprimand was approved by Capt. Broxterman and Assistant Police Chief Paul Neudigate before going to Chief Isaac. Chief Isaac approved it on October 23, 2018. On October 25th, Capt. Broxterman approved it to be served. The reprimand was served on the Grievant on October 29, 2018. (UX 1).

On December 23, 2018, Officer Dennis Barnette responded to a parking complaint call. The African-American individuals involved in that call engaged in a physical altercation. During the incident, Barnette, a white officer, was struck by one of the individuals, restrained her, and told a fellow officer "Nigger slapped me in the face." (UX 6). Complaints were filed and the incident received media attention. The media also learned about the Grievant's incident and wrote about it. (UX 14). Chief Isaac testified that, after Barnette's incident was assigned to be investigated, a member of the Internal Investigations Section told him there was another situation where an officer had used the N word and it was handled at the District level. Isaac

5

further testified that he did not recall the Grievant's incident and did not read Sgt. Putnick's memo closely enough that he saw the language the Grievant used. He then reviewed the video footage of the incident for the first time and sent it to the Internal Investigations Section for a full investigation on December 28, 2018. (CX 1). That same day, the Grievant's police powers were suspended. (UX 3).

Sergeant Steven Fox conducted the investigation. There is no dispute that the investigation was conducted fairly and completely. Sgt. Fox reaffirmed the written reprimand for a violation of Police Department Rule 1.06B and sustained the specification that the Grievant's conduct further violated Rule 1.23C and City Administrative Regulation No. 25. (CX 1). A Department Level Hearing was held before Captain Douglas Wiesman on March 22, 2019. He concluded that the Department had given the Grievant a written reprimand on October 29, 2018 for use of the N word during the September incident and the Internal Investigations Section investigation found no additional information other than what the Department knew at the time of the written reprimand. Capt. Wiesman did not sustain the 1.23C and Regulation 25 specification on the basis that the Department had erred in not disciplining the Grievant for the additional rules at the time and it was fundamentally unfair to do so after the initial adjudication. Capt. Wiesman also recommended the Grievant receive further training. (UX 5). On April 19, 2019, Chief Isaac approved the recommendation for further training and sustained the Rule 1.23C and Administrative Regulation No. 25 violations, imposing a seven day (56 hour) suspension. The suspension was imposed on June 12, 2019.

On April 26, 2019, the Grievant filed a lawsuit in Hamilton County for an injunction against the suspension. (UX 6). The Grievant's police powers were reinstated that day. The Grievant testified that he lost the ability to work details and was put on leave from the Deer Park-Silverton Joint Fire District. He provided calendars showing the days he typically worked details and as a firefighter/EMT. (UX 9 and 10). The Grievant also calculated his lost earnings, including as a firefighter/EMT. The breakdown showed lost revenues from the Cincinnati Police

Deparment of $29,348. He testified that, when his part-time work with Deer Park-Silverton were included, his total damages were $31,676. (UX 8).

## V. POSITION OF THE EMPLOYER

The grievance should be denied. The City had just cause to discipline the Grievant. The Arbitrator should affirm the 56 hour suspension of the Grievant for using a racial slur in violation of Rule 1.23C and Administrative Rule No. 25. The Cincinnati Police Department has adopted various disciplinary rules. These include 1.23C, which prohibits prejudicial or offensive comments. This served as notice to the Grievant that his conduct was inappropriate and subject to discipline. Simply put, the use of the N word is unacceptable. Additionally, there can be little doubt that Rule 1.23C is reasonably related to the City's business. Its Police Department is the primary law enforcement agency and its members interact with citizens of all races, nationalities, lifestyles, genders, and personal characteristics. It is essential that officers do not engage in discriminatory harassment while performing their duties.

The City conducted a thorough investigation of the allegations made against the Grievant. It interviewed a number of witnesses, reviewed the body camera footage, and spoke with the Grievant before administering the discipline. The investigation was fair and objective. The Union's argument that reopening the investigation was done to impose a harsher penalty following Officer Barnette's incident should be rejected. Chief Isaac testified that the investigation was reopened not so a harsher penalty could be imposed on Officer Barnette, but because he mistakenly signed off on the Grievant's reprimand. When he learned that the Grievant had received only a reprimand for his use of the N word, he realized the mistake and ordered an investigation from scratch. Sgt. Fox was not directed in any way during his investigation and reached his own conclusion that the Grievant violated 1.23(C).

There was substantial evidence to support the violation. The Grievant has admitted that he used the N word. Indeed, he contends that he has used it daily, that it is not intended to be offensive, and that, if those who hear it are not offended, there is no violation. Accepting this argument, however, would force the City to accept inappropriate behavior. Taking it to its logical

conclusion, an officer would be immune from discipline if someone did not complain about the behavior. In any event, those involved in the September 2018 incident were offended. The Union's argument that the N word is acceptable in the African-American community is a red herring. Regardless of its acceptability in the community, the City can require its officers to use appropriate language when performing their duties.

The City has applied its rules evenhandedly. The Union's contention that a written reprimand is the appropriate punishment ignores that the Grievant was found guilty of a Rule 1.23C violation. The N word is an offensive and inflammatory racial slur and the Grievant's suspension was consistent with other 1.23C and Administrative Regulation No. 25 violations. The discipline the Union pointed to did not involve Rule 1.23C violations. Furthermore, the Grievant's suspension was reasonably related to the seriousness of his conduct and his employment history. Determination of a disciplinary penalty is within management's discretion and arbitrators should not second guess that discretion. Typically, arbitrators will uphold discipline unless it is arbitrary, capricious, an abuse of discretion, or otherwise unreasonable. The use of the N word is simply wrong for an officer whose job it is to serve and protect. It undermines the public's confidence in the Police Department and could cause problems at the scene.

The Arbitrator should not accept the Union's claim of double jeopardy. Double jeopardy only applies when the prior discipline was the result of a full hearing and the employer had full knowledge of the facts. Here, that was not the case. A Department Level Hearing only took place following Sgt. Fox's investigation and found violations of 1.23C and Administrative Regulation No. 25 in addition to the 1.06B violation. The investigation yielded unknown information contrary to what Capt. Wiesman found, including that those at the scene were offended by the N word and other language and the Grievant's demeanor. The Grievant also explained his incredible theory that the N word is appropriate if the listener is not offended and that his use of it was not derogatory. Since no Internal Investigations Section investigation was done before imposing the written reprimand, there was no opportunity to learn this information.

Additionally, when there is more than one misconduct by an employee, more than one punishment is permitted. Here, there were two misconducts — the profane language and the racial slur — that violated separate rules — 1.06B and 1.23C and Administrative Regulation 25. The first misconduct warranted a written reprimand, while the second warranted the 56 hour suspension. Thus, there was no double jeopardy. Additionally, it should be noted that the Grievant admitted he still uses the N word, so the written reprimand did not change his behavior.

The Union has argued that the Arbitrator has broad remedial authority and includes ruling on the propriety of the Chief's ability to suspend police powers. While this might conceivably include compensation for loss of income that stemmed from the suspension of police powers, the Arbitrator cannot rule on the Chief's ability to suspend police powers. The grievance does not challenge that authority and the Union acknowledges the ability to suspend those powers.

## VI.　POSITION OF THE UNION

The grievance ought to be sustained. The Employer failed to prove that the Grievant was suspended for just cause. The Grievant should be made whole for the 56 hours suspension and the suspension removed from his record. Additionally, he should be awarded the income he lost from overtime with the Employer, off-duty details, and wages he lost with the Deer Park-Silverton Joint Fire District. The total lost income is $31,676 and the Grievant should be awarded that amount.

The Grievant did not use the N word in a discriminatory, prejudicial, or derogatory manner as required by Employer rules. Rather, he used the word "nigga," which is commonly used in the African-American community. The Grievant testified that, after receiving the reprimand, he understands the Employer does not want him to use that word and he has not used it since. This is corroborated by Sgt. Putnick's interview, during which he noted that he has been on runs with the Grievant and not heard him use the term. Chief Isaac's testimony that it is not common for African-Americans to use "nigga" and that it is equally as offensive as the N word is contradicted by the Grievant's body worn camera, which recorded the individuals

9

involved in the incident using the word "nigga" repeatedly. Additionally, the Grievant testified that it is used daily, and is frequently used in music and comedy. Further, in his interview, Sgt. Putnick indicated he does not believe the Grievant used the word in a racial manner. And the Officer Barnette arbitration demonstrated that officers use the N word and it is frequently used in the African-American community.

The 56 hour suspension was excessive. The Grievant is a good officer with a good work record. An 11 year veteran, he has an ESL entry for using profane language in August 2107. He should not have received a 56 hour suspension for using a word that is commonly used and was not meant to degrade or demean anyone. Moreover, none of those involved in the incident complained about his use of the word. The purpose of discipline is to correct behavior, which the written reprimand did. The Grievant testified that he has not used it on duty since he was reprimanded. And the Administrative Regulation charge is inappropriate because the Grievant did not receive training regarding it until after the incident in question. The 56 hour suspension is punitive, not corrective. Finally, discipline is also meant to deter others from engaging in the same behavior. The media attention given in the Grievant's and Officer Barnette's incidents and how the Employer has indicated it will handle such situations in the future are sufficient deterrents.

The Employer violated the concept of double jeopardy here. It cannot impose a suspension for the same incident that resulted in a written reprimand to the Grievant. Arbitral precedent is clear that, once discipline is issued for an offense, another punishment cannot be imposed. At the Department Level Hearing, Capt. Wesman noted that the Grievant had already been reprimanded for the September 2108 incident, that the reprimand had been approved, sustained, and adjudicated, and no new information resulted from the new investigation. He recommended a finding of not sustained. The Chief's testimony that he did not notice that the Grievant had used the N word when he approved the Grievant's reprimand is suspect.

The Arbitrator can review the suspension of police powers and loss of income from overtime and off-duty details because it is part of the just cause analysis. Suspending the

Grievant's police powers for four months was punitive. During the federal court lawsuit filed by the Grievant and Officer Barnette, the Employer acknowledged that an arbitrator could remedy the loss of overtime and details through the exercise of police powers, and it should be dealt with in arbitration. The Employer cited *Queen City Lodge No. 69, FOP v. City of Cincinnati*, 63 Ohio St. 3d 403 (1992), which held that arbitrators possess implicit remedial power unless the collective bargaining agreement restricts a particular remedy.

Here, the Grievant received a reprimand and continued working, including off-duty details, until a white officer used the N word several months later. Since the Chief could not impose severe discipline against the white officer when the Grievant had only been reprimanded, the Grievant's police powers were suspended. The suspension was lifted once the federal lawsuit was filed, however. The Grievant testified that he regularly worked details and provided his calendar to document them and the overtime he worked. Since details are posted in advance, even when his police powers were restored in April, he lost out on details in May. The Grievant was also put on leave from the Deer Park-Silverton Joint Fire District until the situation with the City was resolved. These damages should be included in any award.

### VII.  OPINION

The Employer bears the burden of proving that just cause exists for the Grievant's discipline. Just cause generally requires persuasive proof that the rules or policies cited for the discharge were violated and the discipline was proportionate to the offense. That is, the discipline imposed was reasonable under the totality of the circumstances. Usually, the just cause standard favors progressive discipline, which gives the employee an opportunity to correct behavior and provides notice that failure to do so will lead to more severe discipline. However, progressive discipline need not always follow an oral warning, written warning, suspension, and discharge in lock step order. The facts and circumstances of each particular case dictate the appropriate disciplinary level. Finally, no citation is needed for the principle that employers have the initial discretion to impose discipline for proven misconduct. Generally, arbitrators will not second guess management so long as the penalty imposed is reasonable

under the facts and circumstances. On this record, the Arbitrator concludes the Employer violated the Agreement when it suspended the Grievant for 56 hours on April 19, 2019.

As a preliminary matter, the Arbitrator finds it is not necessary for purposes of this award to distinguish between the words "nigger" and "nigga," determine whether one is or is not acceptable, and whether the Grievant used either word in a discriminatory, prejudicial, or derogatory manner as required by Employer rules. The Arbitrator agrees with the Employer that it can require its officers to use appropriate language when performing their duties. Moreover, the FOP acknowledged that the Grievant is on notice that use of either word is inappropriate while on duty. Indeed, the Grievant testified that he now understands the Employer does not want him to use such language and he has not used it since receiving the written reprimand.

The Agreement allows the City to suspend for just cause. (JX 1). The concept of just cause includes a number of factors, including timely action, a fair investigation, notice of the grounds for discipline, the employee's right to be heard, and double jeopardy. Arbitral authority is clear that disciplining an employee twice for the same act constitutes double jeopardy and is a due process basis for invalidating the discipline. Here, the Grievant was issued a written reprimand for the language he used on September 26, 2018. (UX 1). Because the incident involved the use of force, Sgt. Putnick reviewed the body camera footage and heard the language. He determined it was inappropriate and advised Capt. Broxterman. Broxterman also reviewed the footage and agreed that a written reprimand should be issued. Putnick's memo to Chief Isaac included the Grievant's language "that got damn alcohol out here got you niggers acting stupid," as well as "because I'm pissed the fuck off that's why," and a link to the body camera footage. Sgt. Putnick specifically noted the language was not verbal stunning and requested a reprimand for a violation of Rule 1.06B. (UX 1). The written reprimand was approved by Capt. Broxterman, Assistant Chief Neudigate, then Chief Isaac, and was served on October 29, 2018.

Officer Barnette's incident occurred in December, a mere two months later, and received considerable media attention. One City Councilwoman even introduced an ordinance to make

12

the use of racial slurs when dealing with the public a dischargeable offense. (UX 14). After assigning the Officer Barnett incident for investigation, Chief Isaac testified that he was told that the Grievant had also used the N word and that it was handled at the District level. He then reviewed the body camera footage for the first time and, upon hearing what the Grievant said, sent it for investigation, which resulted in the suspension.

This is a classic double jeopardy situation. In October, the Grievant was reprimanded for his language under Rule 1.06B. This was approved by Chief Isaac. The Chief acknowledged that he received Sgt. Putnick's memo, but did not read it closely enough. It matters not whether he read the memo carefully enough, he agreed with the reprimand and it was issued. (UX 1). When the incident was investigated by the IIS in early 2019, no additional information as to the Grievant's conduct was learned. Indeed, the body camera footage was the primary evidence once again. While the body camera footage of Officers Shook and Contris, who also responded to the call, was reviewed by the IIS, their cameras recorded the same comments. Furthermore, the Grievant has not denied making them. The Grievant was disciplined because of those comments, nothing else.

The City argues that new information was learned during Sgt. Fox's investigation, including that the individuals involved in the incident were offended by the Grievant's remark. This argument misses the mark. Nothing new about the Grievant's misconduct was discovered — the body cameras recorded his comments and these comments were known in October when the written reprimand was issued. Even if new information had been discovered, that does not necessarily mean the City could have disciplined the Grievant based on that information. It is only when an employer's incomplete knowledge of the facts at the time of the initial discipline was not the employer's fault that double jeopardy might not occur. For example, if information is intentionally kept from an employer, it may be able to impose additional discipline upon discovering it without causing a double jeopardy situation. That did not happen here. The Grievant's comments were included in Sgt. Putnick's memo, along with a link to the body camera footage. The Chief admitted that he simply did not read the memo carefully enough and

did not look at the footage. Thus, the City had all the information as to the Grievant's misconduct in October and acted on it by issuing the written reprimand. It cannot go back and issue additional discipline for the same misconduct. Simply put, Chief Isaac erred in not reading the memo closely enough and conducting a full investigation. That his error was later brought to his attention does not justify trying to correct it by disciplining the Grievant again. Rather, the City must live with the error. Suspending the Grievant in April for the same conduct upon which his reprimand was based was double jeopardy and invalidates the suspension.

The Employer also contends that there were two misconducts, one that violated 1.06B and another that violated 1.23C. The Arbitrator disagrees. There was one misconduct — the Grievant's use of the N word. The Employer chose in October — whether rightly or wrongly — that it violated Rule 1.06B. When it issued the suspension in April, it did so based on the same misconduct — the use of the N word. It simply decided that the same words also violated Rule 1.23C. Thus, there was not a second misconduct and suspending the Grievant was double jeopardy.

Finally, the City submits that double jeopardy applies only when the prior discipline was the result of a full hearing and the employer had full knowledge of the facts. The Arbitrator rejects this argument. First, the City cites no authority that a full hearing must be conducted. Second, as noted above, the City had full knowledge of the facts when it issued the written reprimand. Sgt. Putnick had reviewed the video, heard the use of the N word, found it inappropriate, and the reprimand was approved. The City had full knowledge of the comments when it did so. The later suspension was based on the very same full knowledge of the facts — the Grievant's comments — and issuing more severe discipline violated the concept of double jeopardy.

This leads to the question of damages. The Arbitrator agrees with the City that he cannot rule on the ability of the Chief to suspend the Grievant's police powers. He can, however, provide relief for the effect the suspension had on the Grievant's earnings. Obviously, the Grievant must be made whole for the 56 hour suspension. Additionally, he testified that the loss

14

of his police powers meant he could not work details that he regularly worked, as well as losing his part-time work with Deer Park-Silverton. (UX 8-10). The Arbitrator, though, has no authority over Deer Park-Silverton. The Agreement here is between the City and the FOP and the Arbitrator can only award damages against the City, not another entity the City does not control or influence in any way. Thus, any relief can be assessed against the City only.

VII. **AWARD**

The grievance is granted. The 56 hour suspension issued to the Grievant was improper.

1. The Grievant is to be paid for the 56 hours he was suspended.

2. The 56 hour suspension is to be removed from his record.

3. The Grievant is to be awarded damages for details that he missed. The parties are to meet and attempt to agree on the amount the Grievant is owed for these details. Here, the Grievant introduced calendars showing the dates he typically worked details and his calculations as to the amounts he earned. They are to be used as the starting point and the City has the burden to dispute the Grievant's calculations.

4. The Arbitrator retains jurisdiction for 90 days to resolve disputes as to the remedy only, unless either party requests an extension of that 90 days.

Dated: December 5, 2019

_____
Daniel G. Zeiser
Arbitrator

15