IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Donte Hill, | : | |
| | : | Case No. 1:19-cv-308 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| City of Cincinnati, *et al.*, | : | Part Defendants' Motion for Summary |
| | : | Judgment |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 34). Plaintiff has filed a Memorandum in Opposition (Doc. 37) to which Defendants filed a Reply (Doc. 38). Plaintiff Donte Hill, who is African American, was formerly an officer with the City of Cincinnati Police Department. He alleges that Defendants City of Cincinnati, Ohio, Chief of Police Eliot Isaac, and now former City Manager Patrick Duhaney[1] discriminated against him on the basis of his race and violated his due process rights when they suspended his police powers after he used a variation of the N-word while on duty. Defendants deny the claims against them. For the reasons that follow, the Court will **GRANT IN PART AND DENY IN PART** the Motion for Summary Judgment.

I.   **BACKGROUND**

A.   **Factual History**

   1.   **CPD Rules**

At all times relevant to this lawsuit, Hill was an officer with the Cincinnati Police Department. He was subject to the Police Department's Manual of Rules and Regulations and Disciplinary Process ("CPD Rules"). The CPD Rules prohibited the following relevant conduct:

---

[1] Officer Hill also named the Fraternal Order of Police Local 69 as a defendant in the First Amended Complaint, but only for the limited purpose to have the Court confirm his Arbitration Award. (Doc. 14 at PageID 125.)

  1.06 A. Members of the Department shall always be civil, orderly, and courteous in dealing with the public, subordinates, superiors and associates.

    B. Members of the Department shall avoid the use of coarse, violent, or profane language.

    C. Members of the Department shall not express any prejudice concerning race, sex, religion, national origin, life-style, or similar personal characteristics.

  * * *

  1.23 A. * * *

    B. * * *

    C. Members of the Department shall not express, verbally or in writing any prejudice or offensive comments concerning race, religion, national origin, life-style, gender, or similar personal characteristics.

(Doc. 31-2 at PageID 400–401.) The CPD Rules contained a disciplinary matrix. The discipline for a violation of Rule 1.06(B) provided for a corrective measure for a first violation, a written reprimand for a second violation, a suspension of up to five days for a third violation, and a suspension of up to seven days for a fourth violation. (*Id.* at PageID 404–405.) The discipline range for a violation of Rule 1.23(C) was higher. The matrix provided for a suspension of up to seven days for a first violation, a suspension of up to eleven days for a second violation, and dismissal for a third violation. (*Id.*)

  Police officers were also subject to the City of Cincinnati Administrative Regulation No. 25. It prohibited comments targeted at individuals based on "age, gender, sexual orientation, gender expression and identity, marital status, disability, religion, race, color, ethnicity, national origin, Appalachian regional ancestry, veteran status, military status, genetic history, or HIV status." (*Id.* at PageID 411.)

  **2.**  **The Disciplinary Incident**

  The incident for which Defendants disciplined Officer Hill occurred on September 26,

2018, at approximately 1:40 a.m. when Officer Hill and his partner responded to a call for police response to a domestic situation at a private residence. (Doc. 31-1 at PageID 207, 263.) During the response, Officer Hill said the following to the individuals at the scene: "That goddamn alcohol got you Niggas out here acting stupid!" (Doc. 31-4 at PageID 447.)² Officer Hill knew the individuals involved by name because he saw them regularly in the community when he patrolled that area. (Doc. 31-1 at PageID 263–264.) The individuals involved in the incident used the term N***a before Officer Hill used it. (*Id.* at PageID 265.) The incident, including Officer Hill's use of the term N***a, was captured on Officer Hill's body camera. (*Id.* at PageID 267.) When Officer Hill was asked at the arbitration hearing why he used the term, he stated that he "use[d] it every day" and "it was basically just telling them, because it was alcohol, is the reason why you guys are acting like this." (*Id.* at PageID 269.) He did not intend to be offensive or racially discriminatory. (*Id.* at PageID 287–289.)³ Officer Hill further testified that he still used the term in his daily life, but he no longer used it when on duty. (*Id.* at PageID 270–271.) None of the individuals involved in the incident filed a complaint against Officer Hill for his use of the term N***as. (*Id.* at PageID 278.)

The incident originally was investigated for a use of force because another officer used a taser. (*Id.* at PageID 208, 267.) At that point, the reviewing officer recommended that Officer Hill receive a written reprimand for violating Rule 1.06(B), which prohibited the use of coarse,

---

² The first incident report stated that Officer Hill used the term Niggers, not N***as. (Doc. 31-4 at PageID 447.) Officer Hill has testified and continues to maintain that he said N***as, and Defendants do not disagree. Having set forth these terms once for the sake of the record, the Court will now use the common substitutions N-word and N***a or N***as.

³ Officer Hill testified at the arbitration hearing that the thinks the term N***er is "different" than the term N***a. He stated that N***er is offensive, but N*** a is not offensive. (Doc. 31-1 at PageID 292.) Likewise, the FOP President testified at the arbitration at length about how the N-word can be and is used in the community in a manner intended to be affectionate, not offensive. (Doc. 31-1 at 314–319.) Much can and has been written about the offensive and purportedly non-offensive use of the N-word, but the Court need not examine here whether Officer Hill's use of the term N***a was intended to be or was offensive.

violent, or profanes language, because he said N***as one time and other cuss words multiple times. (*Id.* at PageID 208, 210–211; Doc. 31-2 at PageID 376, 400.) It was his second violation of Rule 1.06(B). (Doc. 31-2 at PageID 364.) Chief Isaac approved the discipline without watching a video of the incident:

> This is Form 17 he brought to my attention. Now, normally, situations like this, when we have an officer that engages in this type of behavior, this is something that normally I would get a form or memo from the district commander regarding this or a phone call from the district commander or the assistant chief in charge of patrol bringing this to my attention.
>
> This came to me, a one paragraph memo. I did initial it and approve it on the 23rd of October. And to my err, I did not read it closely enough.
>
> * * *
>
> I saw this one page, this one paragraph form. I did not read it closely enough. I saw that it had been approved by the assistant chief, PWN, which is Paul Neudigate. He is the assistant chief in charge of patrol.
>
> I thought that it had its due diligence. And on my error, I did not read it close enough.

(Doc. 31-1 at PageID 241, 243; Doc. 31-4 at PageID 447.) The written reprimand dated October 29, 2018 cited Officer Hill for violating Rule 1.06(B). (Doc. 31-2 at PageID 365–366.)

Two months later, in the last week of December 2018, the matter was brought to Chief Isaac's attention a second time after he approved a more severe discipline for Officer Dennis Barnette, a white police officer, who had used the N-word to describe a woman who struck him during an arrest. (Doc. 31-1 at PageID 240, 244.)[4] Chief Isaac for the first time watched the

---

[4] Officer Barnette has a separate lawsuit pending against the City of Cincinnati, Chief Isaac, and former City Manager Duhaney in this Court, *Barnette v. City of Cincinnati*, No. 1:19-cv-309 (S.D. Ohio). Officer Barnette also had his police powers suspended for approximately four months, and he received a 7-day unpaid suspension for violating Rule 1.23(C) and Administrative Regulation No. 25, both for his use of the N-word. (Case No. 1:19-cv-309, Doc. 30 at PageID 275.) Officer Barnette grieved the 7-day unpaid suspension issued under the authority of the collective bargaining agreement. The grievance resulted in an Arbitration Award in favor of Officer Barnette. The arbitrator issued a Decision sustaining the grievance, reducing the 7-day unpaid suspension to a written warning, ordering that he be "made whole" for the unpaid suspension, and ordering that he be "made whole for the extra employment opportunities lost when his Police powers were suspended." (Case No. 1:19-cv-309, Doc. 8 at PageID 112.)

video of the September incident involving Officer Hill and his use of the term N\*\*\*as. (*Id.*) Chief Isaac then requested a full investigation of Officer Hill's incident. (*Id.* at PageID 241–242, 244.) The initial written reprimand had been issued under only Rule 1.06(B), but after Officer Barnette's incident, Officer Hill was investigated for violating Rule 1.06(B), Rule 1.23(C), and Administrative Regulation 25. (*Id.* at PageID 245.) Chief Isaac explained that a sanction for violating Rule 1.06(B) was sufficient for cursing and profanity, but not for something that was racially motivated. (*Id.* at PageID 245.)

Chief Isaac used his discretionary authority to suspend Officer Hill's police powers beginning December 28, 2018. (Doc. 31-6 at PageID 452; Doc. 37-1 at PageID 708.) While his powers were suspended, Officer Hill received his salary and worked desk duty. However, he could not wear his police uniform, carry his police badge or firearm, or make arrests. (Doc. 31-1 at PageID 271; Doc. 37-1 at PageID 708–709.) Officer Hill also was unable to work overtime for the City of Cincinnati or to work outside details while his police powers were suspended. (Doc. 31-1 at PageID 271; Doc. 37-1 at PageID 708–709.) Officer Hill testified that the majority of officers work outside details to supplement their income, but not all officers. (Doc. 31-1 at PageID 302.) He understood that working outside details was a "privilege" not a "right." (*Id.*) At that time, Officer Hill also was employed as a fire fighter for Deer Park, but the fire chief put him on leave on December 29, 2018. (*Id.* at PageID 262, 282.) The fire chief stated that he put him on leave "for the safety of everybody on the scene, since he did not know how bad this was going to be, he didn't want nobody approaching us while we are trying to do medical care or at a fire and say, you are that black office[r] that used the N-word." (*Id.* at PageID 282.) On April 26, 2019, Defendants lifted the suspension of Officer Hill's police powers and restored him to full duty. (Doc. 31-6 at PageID 453; Doc. 37-1 at PageID 708.)

5

Separate from this discretionary suspension of Officer Hill's police powers, Defendants pursued formal discipline against Officer Hill pursuant to the collective bargaining agreement. The Police Department held a department-level hearing regarding the incident on March 22, 2019. (Doc. 31-1 at PageID 276.) Captain Wiesman was the hearing officer. (*Id.*) Captain Wiesman issued a report on April 8, 2019 in which he recommended that Chief Isaac find that it had been proper to only issue a written reprimand for the violation of Rule 1.06(B). Captain Wiesman recommended against imposing additional discipline for a violation of Rule 1.23(C). (*Id.* at PageID 244, 276; Doc. 7 at PageID 82.) Nonetheless, Chief Isaac approved a 7-day (56-hour) unpaid suspension for a violation of Rule 1.23(C) and Administrative Regulation 25. (Doc. 7 at PageID 82.) The City issued a Notice of Suspension imposing the 7-day unpaid suspension under the collective bargaining agreement on May 31, 2019. (*Id.*; Doc. 11 at PageID 103.)

The Fraternal Order of Police ("FOP") Local 69 filed a grievance on Officer Hill's behalf as to the 7-day unpaid suspension under the collective bargaining agreement. (Doc. 11 at PageID 103.) The arbitration was heard on October 3, 2019. (Doc. 31-1.) The primary issue grieved was "whether there was just cause under the contract for the [7-day] 56-hour suspension." (*Id.* at PageID 206.) The arbitrator issued a Decision on December 5, 2019 concluding as follows: (1) the unpaid suspension was improper under the collective bargaining agreement; (2) the suspension had to be removed from Officer Hill's record; and (3) the parties had to meet and attempt to agree on the amount Officer Hill was owed for outside details he missed during the suspension of his police power. (Doc. 7 at PageID 87–91.)

Officer Hill's employment with the City of Cincinnati Police Department ended in

August 2020.  (Doc. 37-1 at PageID 708.)[5]

**B.      Procedural Posture**

Officer Hill filed suit against the City of Cincinnati, Chief Isaac, and former City Manager Duhaney on April 26, 2019 in the Court of Common Pleas for Hamilton County, Ohio. (Doc. 3.)  Defendants removed the matter to this Court on April 29, 2019.  (Doc. 1.)  The Court then stayed the matter on May 10, 2019 pending completion of the arbitration.  (Doc. 5.)

On July 3, 2020, Officer Hill filed the First Amended Complaint and the Motion to Confirm Arbitration Award.  (Docs. 14, 15.)  He alleges that the City of Cincinnati, Chief Isaac, and City Manager Duhaney are liable for race discrimination in violation of Ohio Revised Code § 4112.02 and the United States Constitution and for a violation of his substantive and procedural due process rights, both based on the discretionary suspension of his police powers. (Doc. 14 at PageID 128–129.)  As stated in an earlier footnote, Officer Hill named the FOP Local 69 as a nominal defendant only because it was a necessary party to confirm the Arbitration Award.  The Court confirmed the Arbitration Award on October 14, 2020.  (Doc. 26.)

Following an unsuccessful mediation and a period of discovery, Defendants filed the pending Motion for Summary Judgment on August 27, 2021.  (Doc. 34.)  The matter is now fully briefed and ripe for adjudication.

**II.     SUMMARY JUDGMENT STANDARDS**

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663

---

[5] Officer Hill did not explain how or why his employment ended.

F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

Officer Hill asserts claims for race discrimination and violation of 14th Amendment rights against the City of Cincinnati, Chief Isaac, and City Manager Duhaney. He asserts the claims against Chief Isaac and City Manager Duhaney in their official and individual capacities.

8

The claims against Chief Isaac and City Manager Duhaney in their official capacities are co-extensive with and will be treated the same as the claims against the City of Cincinnati.

**A.     Race Discrimination**

Officer Hill alleges that Defendants discriminated against him on the basis of his race in violation of Ohio Revised Code § 4112.02 and in violation of the United States Constitution. The Fourteenth Amendment states in relevant part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14 § 1. "A plaintiff asserting a Fourteenth Amendment equal protection claim [for race discrimination] under 42 U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim under Title VII." *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir. 2000). Under both statutes, "the plaintiff must establish by a preponderance of the evidence that [he] was the victim of intentional or purposeful discrimination." *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988). Similarly, the Ohio Revised Code makes it unlawful for an employer "because of the race . . . of any person, to discharge without cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment." Ohio Rev. Code § 4112.02(A). Disparate treatment discrimination claims brought under Ohio law are governed by the same standards as federal claims. *See Woods v. FacilitySource, LLC*, 640 F. App'x 478, 483 (6th Cir. 2016); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (1981). Accordingly, the Court will look to Title VII case law to analyze the race discrimination claims, though Officer Hill did not plead a Title VII claim.

To set forth a prima facie case of race discrimination using circumstantial evidence, a plaintiff must establish "that he was (1) a member of a protected class, (2) subject to an adverse

9

employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). If the plaintiff meets his prima facie case, the burden of production shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse action. *Id.* Then the plaintiff must rebut the employer's argument by introducing evidence of pretext. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "The three-part test need not be applied rigidly. Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (cleaned up). "The trier of fact may consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up).

The Court begins by pointing out that Officer Hill has presented no argument or evidence upon which City Manager Duhaney could be held individually liable for race discrimination. No facts were presented at the arbitration hearing upon which liability could be based. Officer Hill has not established that City Manager Duhaney participated in or approved the decision to suspend Officer Hill's police powers. The Court will grant City Manager Duhaney summary judgment on the race discrimination claim made against him in his individual capacity.[6] Thus,

---

[6] The same analysis and conclusion apply to the due process claim against City Manager Duhaney. Officer Hill has presented no evidence upon which City Manager Duhaney could be held liable for violating his due process rights. In addition, the Court concludes later in the analysis that Officer Hill has not established a violation of his due process rights in any event.

the remaining analysis of the race discrimination claims against Defendants pertains only to Chief Isaac, individually, and the City of Cincinnati.

Starting with the prima facie case, Defendants do not dispute that Officer Hill is a member of a protected class and that he is qualified for his position. They dispute, however, whether he suffered an adverse employment action and whether he was treated differently than similarly-situated employees. The Court will examine the adverse employment action issue first.

The Sixth Circuit held in 1999 that the suspension of a police chief *with pay* pending a timely investigation did not constitute an adverse employment action. *Jackson v. City of Columbus*, 194 F.3d 737, 744, 752 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). Similarly, the Sixth Circuit stated that "being placed on *paid* administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action." *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017) (emphasis added). On the other hand, the Supreme Court concluded that a jury reasonably had found that an employee suffered an adverse employment action when she was suspended for 37 days *without pay* even though the employer ultimately reinstated her with backpay pursuant to a union grievance. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58, 72 (2006) (noting the physical and emotional hardship of having to live for 37 days without income).

Here, Officer Hill received his salary during the four months his police powers were suspended, but he was denied the opportunity to earn income from overtime, outside details, and his fire fighter position with Deer Park. Lost opportunity for overtime and outside details can constitute an adverse employment action. *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 684–685 (N.D. Ohio 2006); *see also Broska v. Henderson*, 70 F. App'x 262, 268 (6th Cir. 2003) ("[A]llegations of a denial of overtime, properly supported, could constitute an adverse

11

employment action."). The fact that Officer Hill was compensated for these lost earnings through the arbitration process is not dispositive of the issue of whether he suffered an adverse employment action. *See Burlington*, 548 U.S. at 72. The Court concludes that Officer Hill has created at least a question of fact for a jury on the adverse action prong.

Turning to the similarly-situated employees prong, whether individuals are similarly situated generally is a question of fact for the jury. *See Loesel v. City of Frankenmuth*, 692 F.3d 452, 462–463 (6th Cir. 2012); *JDC Mgmt., LLC v. Reich*, 644 F. Supp. 2d 905, 927 (W.D. Mich. 2009). Here, Chief Isaac suspended the police powers of Officer Hill and Officer Barnette, pending formal investigations and discipline, for using variations of the N-word (N****a and N***er, respectively) while on duty. The circumstances are unusual because Chief Isaac's apparent intent was to discipline the two officers, one African American and one white, in the same manner. However, the mere fact that Defendants punished Officer Hill two times for the single offense—first by issuing the written reprimand in October 2018 and then by suspending his police powers in December 2018—while Officer Barnette was not disciplined two times is enough for a jury to conclude that the similarly-situated officers were treated differently.

Because Officer Hill has met his prima facie burden, the Court turns to Defendants' stated legitimate non-discriminatory reasons. Defendants rely on Chief Isaac's arbitration hearing testimony in which he stated that he erred in approving the written reprimand discipline without reading the Form 17 more closely. Officer Hill, therefore, must prove pretext. Here, he has identified sufficient evidence from which a jury could conclude that the stated reason his police powers were suspended had no basis in fact, was not the actual reason, or was insufficient to explain the Defendants' action. *See White*, 533 F.3d 393 (setting forth pretext standard).

The Form 17 approved by Chief Isaac in October 2018 explicitly stated that Officer Hill

used "excessive profane language fourteen times" and that Officer Hill used the word "n****ers." (Doc. 31-2 at PageID 364.) It also stated that the body camera footage existed. (*Id.*) Yet Sergeant Luke Putnick recommended, and Chief Isaac approved, that Officer Hill be issued only a written reprimand for violation of Rule 1.06(B), a prohibition against use of coarse, violent, or profane language. Nonetheless, two months later, Chief Isaac suspended Officer Hill's police powers and ultimately issued him a 7-day unpaid suspension for making a prejudicial or offensive comment about race in violation of Rule 1.23(C). The underlying facts upon which Chief Isaac based these sanctions had been presented to him in the Form 17 in October 2018. The only new information available to Chief Isaac was that Officer Barnette was being investigated for using the N-word on duty in an incident which had generated media attention. (Doc. 31-1 at PageID 239–240.)

Additionally, no other officer had been sanctioned under Rule 1.23(C), which prohibited making offensive comments about race, gender, and lifestyle, for at least ten years. (*Id.* at PageID 317, 322.) FOP President Daniel Hils testified at the arbitration hearing that he had heard other officers, white and black, use the N-word. (*Id.* at PageID 317.) He also testified that officers who used terms including "dike-ass bitch[,]" "fruitcake[,]" and "girly-man" received only written reprimands. (*Id.* at PageID 322–325.) This evidence at least suggests that Chief Isaac suspended Officer Hill's police powers because he did not want to be seen as disciplining an African-American officer less harshly than he had just disciplined Officer Barnette, a white officer. The Court concludes that this evidence, considered as a whole, is sufficient to present a jury question on pretext. For these reasons, the Court will deny summary judgment to Defendants City of Cincinnati and Chief Isaac on the race discrimination claims.

B.  **Due Process**

Officer Hill purports to assert both substantive and procedural due process claims against Defendants pursuant to § 1983. The Fourteenth Amendment states in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. The Court first will examine the substantive due process claim.

The Sixth Circuit has explained substantive due process as follows:

> "The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process." *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (citation omitted)). These limitations are meant to provide "heightened protection against government interference with certain fundamental rights and liberty interests." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L.Ed.2d 772 (1997)). As a result, "Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Id.* at 574 (citing *United States v. Brandon,* 158 F.3d 947, 956 (6th Cir. 1998)); *see also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005).

*Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

The list of fundamental rights entitled to substantive due process protection "is short." *Id.* (citation omitted). Fundamental rights include the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *Wash. v. Glucksberg,* 521 U.S. 702, 720 (1997). "When reviewing a substantive due process claim, we must first craft a careful description of the asserted right, and then determine whether that right is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that it can be considered a fundamental right." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (cleaned up).

14

Officer Hill has not articulated what fundamental right of his was violated in such a manner as to constitute a violation of substantive due process. At most, he alleges that it violated his substantive due process rights to have his police powers suspended in a racially discriminatory manner. However, "the Supreme Court has held that the concept of substantive due process has no place when another provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff." *McClafferty v. Portage Cty. Bd. of Elections*, 661 F. Supp. 2d 826, 834 (N.D. Ohio 2009) (citing *Albright v. Oliver,* 510 U.S. 266, 273 (1994)). It follows that "where the party's substantive due process claim is based on alleged acts of discrimination, that claim should be analyzed under the framework of the Equal Protection Clause rather than as a substantive due process claim." *Id.* (quoting *Fernandez v. City of Pataskala,* No. 2:05-cv-75, 2006 WL 3257389, at *2 (S.D. Ohio Nov. 9, 2006)). This Court has addressed Officer Hill's race discrimination claims under the Equal Protection Clause above. Officer Hill cannot separately assert a substantive due process claim based on the race discrimination allegation. The Court will grant summary judgment to Defendants on the substantive due process claim.

The Court turns next to Officer Hill's procedural due process claim. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Due process is implicated "when state conduct 'alters a right or status previously recognized by law.'" *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). "The first step in determining whether procedural due process has been denied is to ask whether there exists a liberty interest or property interest which has been interfered with by the

15

defendants." *Jackson*, 194 F.3d at 749 (internal quotation and citation omitted). "If the court determines that there has been such a deprivation, the remaining question is what process is due." *Id.* "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation and citation omitted).

Accordingly, Officer Hill first must establish that he had a protectable property interest as a prerequisite to proving his procedural due process claim. He has not met this burden. Officer Hill suggests in his brief that his claim is based in part on the 7-day unpaid suspension. This argument is inconsistent with his claims in the First Amended Complaint, which are based on the suspension of Officer Hill's police powers. He alleged that "[t]he suspension of Officer Hill's police powers is an adverse employment action that violates Officer Hill's Constitutional rights and violates Chap. 4112 of the Ohio Revised Code." (Doc. 14 at PageID 128.) Also, Officer Hill has not established that the grievance and arbitration procedure did not afford him sufficient due process for the 7-day unpaid suspension.

As for the suspension of his police powers, Officer Hill has not established that he had a property right to the benefits—overtime and outside details—that he was denied. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Officer Hill has not proven that he had more than a unilateral expectation to his police powers. The suspension of a police officer with pay does not implicate due process rights. *See Jackson*, 194 F.3d at 749 (6th Cir. 1999). Moreover, a police officer has no property rights to outside details or overtime earnings if the police department has discretion

16

whether to approve such work. *See O'Donnell v. City of Cleveland*, 838 F.3d 718, 730–731 (6th Cir. 2016).

Here, FOP President Hils testified at the arbitration proceeding that Chief Isaac had discretion to suspend police powers. (Doc. 31-1 at PageID 330.) The written policy governing "outside employment" for the Cincinnati Police Department states that "[a]ll details require the proper permits and authorization by the Police Chief." (Doc. 34-1 at PageID 663.) Officer Hill, likewise, agreed that working outside details was a "privilege" and not a "right." (Doc. 31-1 at PageID 302.) Given these facts, Officer Hill has not met his burden to establish that he had a property right in the exercise of his police powers.[7] The Court will grant summary judgment to Defendants on the procedural due process claim as well.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. All Defendants are **GRANTED** summary judgment on Officer Hill's due process claims. City Manager Duhaney, in his individual capacity, is **GRANTED** summary judgment on Officer Hill's race discrimination claims as well. The City of Cincinnati and Chief Isaac, in his individual capacity, are **DENIED** summary judgment on the race discrimination claims.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge

---

[7] Officer Hill's argument that he would be entitled to non-economic damages—damages for emotional distress and attorney fees—if he proved a due process claim puts the cart before the horse. He must establish Defendants are liable for violating his right to due process before the damages issue becomes relevant.

17